IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**DENISE CLARK,**                              Case No. 3:15 CV 2212

      Plaintiff,

      v.                              Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                    MEMORANDUM OPINION AND ORDER

### INTRODUCTION

Plaintiff, Denise Clark ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. § 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 14). For the reasons stated below, the undersigned affirms the decision of the Commissioner.

### PROCEDURAL BACKGROUND

Plaintiff filed for SSI in January 2012, alleging a disability onset date of February 1, 2002.[1] (Tr. 67). Her claims were denied initially and upon reconsideration. (Tr. 107, 115). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 120). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on April 30, 2014. (Tr. 14-28). On May 9, 2014, the ALJ found Plaintiff not disabled in a written decision. (Tr. 35-66). The Appeals Council denied Plaintiff's request for review, making the

_____

1. Plaintiff later amended her alleged onset date to January 18, 2012. (Tr. 38, 181).

hearing decision the final decision of the Commissioner. (Tr. 1-7); 20 C.F.R. §§ 404.955, 404.981. Plaintiff filed the instant action on October 28, 2015. (Doc. 1).

## FACTUAL BACKGROUND

### *Personal Background and Testimony*

Plaintiff was 50 years old at the time of her amended onset date, making her a person closely approaching advanced age. (Tr. 26). She had a high school equivalent education, and no past relevant work experience. *Id.*[2]

Plaintiff testified she lived in Toledo with her six children, ages 9, 16, 18, 19, 20, and 21. (Tr. 39). Plaintiff's driver's license had been suspended for tickets or fines, and she had not renewed it because she had just stopped driving. (Tr. 40-41).

Plaintiff estimated she could sit for fifteen minutes before having sharp back pain, stiffness in her lower back, and sharp pain from her knee to toes. (Tr. 42). She testified she would then stand up for five to ten minutes, and then would be able to sit back down. *Id.* After five to ten minutes of standing, she would "get a little wobbly" and use her cane to stand. *Id.* Plaintiff asked the judge to stand during the hearing (Tr. 45). She estimated she could not walk a block, but could walk from the hearing room to the elevator, then stand in the elevator, then walk to the door where her daughter would pick her up. (Tr. 43).

Plaintiff testified she sleeps from three to five hours a night, and dozes off "from the medication" while watching television sometimes. (Tr. 44). She stated even with sleep and anxiety medications, she still wakes up "mostly due to the pain in [her] back". (Tr. 44).

Plaintiff testified Dr. Jones was her treating physician and she had seen him several times per year. (Tr. 50). Dr. Jones had referred her to other places for testing. (Tr. 50-51). Plaintiff

---

2. Plaintiff had a limited work history that did not rise to the level of substantial gainful activity, and the ALJ found Plaintiff had no past relevant work experience. *See* Tr. 19, 26.

testified that she uses a cane every day and Dr. Jones approves of that use. (Tr. 51). At the hearing, she had a cane that her daughter gave her, but she stated she has another one at home that Dr. Jones ordered. *Id.* She testified that without the cane she "veer[s] to the right or either the left . . . or hold[s] the wall." *Id.* The cane helps for balance on both even and uneven surfaces, and she is more apt to lose her balance on an uneven surface. (Tr. 52). She cannot walk quickly on an uneven surface like grass. *Id.*

***Relevant Medical Evidence***[3]

A May 2009 x-ray and CT scan of Plaintiff's cervical spine following a car accident (Tr. 558) showed mild narrowing of the spinal canal and neural foramina bilaterally at C5-6, and suggested muscle spasm (Tr. 562-64). A lumbar spine MRI showed disc narrowing and sclerosis, and was suggestive of inflammatory arthritis. (Tr. 565). Plaintiff was discharged with diagnoses of cervical strain and lumbar strain/sprain. (Tr. 560).

Plaintiff began treatment with Hudson Jones, M.D., sometime in 2008. (Tr. 315-16). She saw Dr. Jones three times in late 2010, complaining of abdominal pain, reflux, depression, and low back pain. (Tr. 500, 502, 504). Dr. Jones diagnosed, among other things, reflux, depressive disorder, and a lumbar region sprain. (Tr. 501, 503, 505). Dr. Jones noted right sided lower lumbar tenderness with spasms, and recommended water physical therapy and pain management. (Tr. 501, 503). Normal gait and station was noted during this time. (Tr. 500, 502). Prescriptions included Percocet, Prilosec, OxyContin, Wellbutrin, Darvocet, and Flexeril. (Tr. 500, 502, 504).

In November 2010, pain management specialist Ahmed Eltaki, M.D., saw Plaintiff on referral from Dr. Jones. (Tr. 341-44; 497-99). Plaintiff described chronic constant lower back

---

3 The undersigned here summarizes only the medical evidence related to the errors Plaintiff raises. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (issues not raised in claimant's brief waived).

3

pain radiating down her right leg. (Tr. 497). He noted her "MRI revealed severe degenerative disk disease at L5-S1 with bilateral neuroforaminal stenosis." *Id.* Examination showed right scoliosis, right lumbar scoliosis, moderate tenderness over the lumbosacral junction, straight leg raise test positive for leg pain on the right side, and Patrick signs were "severely positive" for back pain. (Tr. 498). Dr. Eltaki suggested a caudal epidural steroid injection. *Id.* He noted "adding morphine", and suggested a neurosurgical evaluation if that did not work. *Id.*

Plaintiff returned to Dr. Jones in April 2011 for low back pain, reflux, and depression. (Tr. 493). Dr. Jones noted lumbar spine tenderness and depressed mood. *Id.* Dr. Jones noted she was enrolled in pain management and receiving nerve block. *Id.* He noted tenderness at her lumbar spine and depressed mood. *Id.* She was instructed to continue her medication and follow up with pain management. (Tr. 494). He continued previous diagnoses of lumbar region sprain, reflux, and depressive disorder. (Tr. 493).

In May 2011, Dr. Eltaki gave Plaintiff a caudal epidural steroid injection. (Tr. 491-92). She was instructed to follow up the next week. (Tr. 492).

Plaintiff returned to Dr. Jones twice more in 2011 for problems unrelated to her back and neck. (Tr. 489-90, 487-88).

In February 2012, Plaintiff told Dr. Jones she had "occasional fluttering of heart on and off infrequent duration last 6 months and none for last several days." (Tr. 484). Dr. Jones continued to diagnose sprain lumbar region, reflux esophagitis, and depressive disorder, among other things. *Id.* Dr. Jones referred Plaintiff to cardiology. (Tr. 485).

Plaintiff saw Dr. Jones again in April 2012 for anxiety and reflux. (Tr. 482-83). He prescribed amitriptyline, Ativan, and Zantac. (Tr. 483). Plaintiff was instructed to continue medications, and Dr. Jones noted Plaintiff was "ok for aquatic PT and needs MRI lumbar". *Id.*

4

Plaintiff had several images taken in April 2012 after a car accident. A lumbar spine CT showed "[c]hronic sclerosis involving the vertebral bodies of L5 and S1", and "[a]nnual bulging . . . suspected from L3-4 through L5-S1", but no evidence of acute fracture, subluxation, or central canal compromise." (Tr. 472). A cervical spine CT showed "chronic loss of vertebral body heights involving C5 and C6 is noted an associated with degenerative and hypertrophic changes involving the C5-6 disk space" and "mild spondylosis . . . at multiple levels." (Tr. 470). A cervical spine MRI showed mild to moderate degenerative spondylosis from C3-4 through C6-7, vertebral body heights within normal limits, severe C5-6 disc space narrowing and diffuse disc dissection. (Tr. 480).

Dr. Jones again noted during a June 2012 visit that Plaintiff needed a prescription for aquatic therapy and a lumbar MRI. (Tr. 464). He noted Plaintiff's lumbar spine was tender, and continued prior diagnoses and prescriptions. (Tr. 464-65). Plaintiff returned to Dr. Jones in July 2012 with a tender lumbar spine, complaining of tingling in her right leg. (Tr. 462). At that time, a "normal gait and normal station" was noted. *Id.* Dr. Jones Plaintiff would "need MRI lumbar and EMG and NCV lower extremity." (Tr. 463).

Plaintiff had a physical therapy evaluation in July 2012. (Tr. 523-24). The therapist noted Plaintiff's range of motion and strength were limited, and that she had significant tenderness in her neck, shoulders, and paraspinal muscles. (Tr. 524). She was noted to "ambulate[] essentially normally." *Id.* Plaintiff reported to the physical therapist that prior to the accident, she had been able to complete daily activities easily. (Tr. 523). After three visits, the physical therapist noted Plaintiff "was unable to meet goals . . . and still has high pain levels." (Tr. 522).

In 2012, Dr. Jones added a diagnosis of "neuropathy in other diseases" and possible lumbar disc displacement. (Tr. 454, 462). In August 2012, Mark G. Loomus, M.D., reported that

5

an EMG of Plaintiff's upper limbs was normal and that he could not "explain the numbness in the right hand based on this study." (Tr. 456-61). Dr. Jones acknowledged this finding at a visit in November 2012 where he noted "EMG and NCV studies wnl [within normal limits]". (Tr. 452). During that same visit, Dr. Jones noted "MRI lumbar not done." *Id.* Plaintiff returned later in November complaining of tingling in her hands and feet, and needing medications refilled. (Tr. 450). Dr. Jones continued prior diagnoses and medications, and in his examination noted "spine: a normal exam." *Id.* His instruction was "OK for meds refill and patient will need MRI brain neck and lumbar and she is to [follow up] with NS." (Tr. 451).

In a September 2012 form for the Lucas County Department of Job and Family Services, Dr. Jones noted Plaintiff was to see a neurosurgeon for possible back surgery, and was also to seek mental health services and pain clinic. (Tr. 529).

In December 2012, Plaintiff visited the emergency room for constipation. (Tr. 577). The initial nursing assessment noted normal gait and ambulation and that Plaintiff "walks without difficulty". (Tr. 578). There was no muscular weakness, and a normal lower extremity exam without tenderness or apparent injury. *Id.* The emergency room notes stated: "Fall risk – no ambulatory aid used." (Tr. 579).

In January 2013, Plaintiff reported to Dr. Jones with gastroenterological problems. (Tr. 448-49).

In April 2013, Plaintiff returned to Dr. Jones complaining of neck pain and reporting her colonoscopy found a small polyp. (Tr. 572). Dr. Jones noted cervical spine tenderness ("minimally and ROM full"). *Id.* He ordered an x-ray of Plaintiff's neck and instructed her to continue her medication. (Tr. 573). In October 2013, Dr. Jones again noted tenderness in Plaintiff's lumbar spine, but noted "xrays of neck not done." (Tr. 574). He ordered a thoracic

6

spine x-ray and lower spine x-ray and instructed Plaintiff to continue medications and add lumbar physical therapy. (Tr. 575).

In November 2013, Plaintiff reported to the emergency room with abdominal bloating and pain. (Tr. 591). As part of the emergency room evaluation, Plaintiff had an abdominal and pelvic CT scan, in which severe disc narrowing with degenerative endplate sclerosis at L5-S2 was noted. (Tr. 594-95). Plaintiff was prescribed magnesium citrate and discharged. (Tr. 593).

*Opinion Evidence*

*Treating Physician*

Dr. Jones completed numerous medical source statements for the Lucas County Department of Job and Family Services during the time he treated Plaintiff. (Tr. 315-16 (November 2008), 323-24 (May 2009), 317-18 (April 2010), 326-27 (October 2010), 336-37 (April 2011), 339-40 (November 2011), 529-30 (September 2012), 446-47 (November 2012), 568-69 (April 2013), 570-71 (October 2013)). Dr. Jones checked the box on each of these forms indicating Plaintiff was "unemployable" (Tr. 316, 318, 324, 327, 337, 340, 447, 530, 569, 571), but also checked a box that she was "good/stable with treatment" on many (Tr. 315, 326, 336, 339, 446, 529, 568, 570).[4] Dr. Jones noted medical conditions of degenerative disc disease, lumbar stenosis or lumbar disc displacement, and depression or depressive disorder in each of his opinions (Tr. 326, 336, 339, 529, 568, 570). He also noted cervical stenosis post back surgery (Tr. 315, 323), reflux (Tr. 326), neuropathy (Tr. 568, 570), hypertension (Tr. 570), and osteoarthritis (Tr. 570). In the box for "History of these problems (onset, duration, treatment, prescribed medications, prognosis, etc.)", Dr. Jones listed Plaintiff's medications. (Tr. 326, 336, 339, 446, 529, 568, 570).

---

4. In May 2009, Dr. Jones checked the box for "poor but stable." (Tr. 323).

Each time, he opined Plaintiff could stand or walk for one hour in an eight-hour workday, one-half hour at a time; and sit for one hour in an eight-hour workday, one-half hour at a time. (Tr. 316, 318, 327, 337, 340, 530, 569, 571). He also frequently opined Plaintiff could only lift or carry six to ten pounds for 1/3 or 2/3 of an eight-hour work day. (Tr. 316, 318, 327, 337, 340, 569). In September 2012, he noted Plaintiff had recently been in a car accident, and opined Plaintiff could only lift or carry up to five pounds and was markedly limited in pushing/pulling, bending, reaching, handling, repetitive foot movements. (Tr. 530). He repeated this assessment in November 2012, noting Plaintiff was to "see mental health, labs, pain management, PT, [and a] neurosurgeon – possible back surgery." (Tr. 447). Before this opinion, and once after, Dr. Jones checked the "moderately limited" box for pushing/pulling, bending, reaching, and the "moderately limited" or "not significantly limited" box for handling and repetitive foot movements." (Tr. 318, 327, 337, 340, 569).[5] He returned to the "markedly limited" opinion in October 2013. (Tr. 571).

*Examining and Consultative Physician*

In May 2012, William D. Padamadan, M.D., performed a consultative examination of Plaintiff at the request of the state agency. (Tr. 380-87). He noted Plaintiff wore a cervical collar, and when she removed it, she did not move her neck. (Tr. 381). "But spontaneously, she was able to move quite freely when getting up from the bed to sitting position" and "[s]he had no atrophy of the neck muscles." *Id.* She "showed weakness of the right upper and right lower extremity even though her ambulation and gait were unaffected" and she had normal range of motion in shoulders, elbows, wrists, and fingers. *Id.* Dr. Padamadan noted Plaintiff had difficulty with movements of the right leg and bending the knee and hip caused exacerbation of low back

_____

5. In May 2009, Dr. Jones opined Plaintiff was markedly limited in pushing/pulling, bending, reaching, and handling. (Tr. 324).

pain, while extension relieved it. (Tr. 382). He concluded Plaintiff had "[l]ow back pain since 2005 with narcotic dependence and showing Waddell's signs on examination" and "[n]eck pain, secondary to motor vehicle accident on April 19th, 2012 with Waddell's signs on examination." *Id.* Dr. Padamadan did "not see an indication for limitation of physical activities for sitting, standing, walking, and carrying" and thought Plaintiff "should be able to lift 20-50 pounds frequently and more than 50 pounds occasionally." *Id.* An x-ray performed at Dr. Padamadan's examination showed "mild lumbar scoliosis" and "degenerative disc disease L5-S1". (Tr. 387).

In April 2014, Ryan Lakin, M.D., performed a consultative examination of Plaintiff at the request of the state agency. (Tr. 532-45). Dr. Lakin noted Plaintiff was "not very compliant with the exam", "actively resisted" strength and range of motion testing, said Dr. Lakin "was tormenting her the whole time" and was "obviously exaggerating her symptoms." (Tr. 533). Therefore, Dr. Lakin stated he found "the strength and range of motion testing . . . to be unreliable." *Id.* He also noted she did not show signs of pain and had full range of motion with her neck and upper extremities when undressing and redressing. *Id.* He noted her range of motion of cervical spine and dorsolumbar spine were "limited per the patient." (Tr. 534). Dr. Lakin noted Plaintiff's gait was "abnormal", but that he considered her claim that she cannot take any steps without her cane to be unreliable. *Id.* He also noted she had "[n]o trouble getting on and off the exam table without my assistance." *Id.* Dr. Lakin also noted Plaintiff "claims she is dependent on a cane full-time for ambulation and standing . . . [and] claims she has difficulties with [activities of daily living]. Overall, I feel she is exaggerating her symptoms in today's visit and the extent of her disability is unclear to me." (Tr. 534-35).

He concluded she could lift up to 20 pounds continuously more than six hours in an eight-hour workday, 21-50 pounds occasionally (two hours per day), and greater than 50 pounds

rarely to never. (Tr. 535). He stated she could sit continuously with regular breaks for six hours in an eight-hour workday, 30 minutes at a time. (Tr. 535, 541). She could and stand and walk occasionally for two hours in an eight-hour work day, for fifteen minutes at a time. (Tr. 541). He opined Plaintiff could walk one-half block without her cane, and that the use of the cane was medically necessary. *Id.* In support of this finding, he noted "low back and neck pain" and "difficulty with balance/ambulation long distance." *Id.* He concluded Plaintiff had some limitations in overhead reaching (Tr. 542) and several postural limitations (climbing, balancing, stooping, kneeling, crouching, and crawling) (Tr. 543).

### VE Testimony and ALJ Decision

At the hearing, the ALJ asked a VE to first assume an individual with Plaintiff's age, education and work experience with the residual functional capacity for:

> Work at the light exertional level with postural limitations of no climbing of ladders, ropes or scaffolds, occasional climbing of ramps and stairs, occasional balancing, stooping, kneeling, crouching and crawling, occasional use of the bilateral lower extremities for operation of foot controls. Manipulative limitation of occasional use of the bilateral upper extremities for overhead reaching, frequent use of the bilateral upper extremities for reaching, handling and fingering. Environmental limitation to avoid all exposure to hazards such as moving machinery and unprotected heights. Additional environmental limitation to avoid concentrated exposure to irritants such as fumes, odors, dust, gases and vibrations. Work limited to simple, routine and repetitive tasks in a work environment free from fast paced production requirements such as moving assembly lines and conveyor belts, involving only work related decisions with few if any work place changes, occasional interaction with the general public, coworkers and supervisors.

(Tr. 53-54). The VE testified that jobs such as folder, production inspector, and packer would be available to such an individual. (Tr. 54).

The ALJ then modified the hypothetical, adding two additional limitations: 1) the individual would be allowed to sit or stand alternatively at will provided they are not off task for more than 10 percent of the time and 2) the individual use a cane for ambulation. (Tr. 54). The

VE opined that the previous jobs listed would be available, but at reduced numbers, and an additional job of an assembler would be available. (Tr. 55).

For a third hypothetical, the ALJ asked the VE to keep the previously listed restrictions and limit the work to sedentary, rather than light exertion. The VE testified that jobs such as assembler, bench worker, and bonder would be available. *Id.*

In a fourth hypothetical, the ALJ kept the limitations of the third hypothetical, but the individual would be able to sit for one hour in an eight-hour work day and stand or walk a combined total of one hour in an eight-hour work day. (Tr. 55). The VE stated no work would be available to such an individual. (Tr. 55-56).

In a written decision dated May 9, 2014, the ALJ found Plaintiff had not engaged in substantial gainful activity since the application date. (Tr. 16). He found she had severe impairments of degenerative disc disease, with back and leg pain; status post motor vehicle accident (MVA); neuropathy; upper extremity weakness; depression disorder/dysthymia; anxiety and post-traumatic stress disorder (PTSD); alcohol and cannabis use disorder; and narcotic dependence. *Id.* He concluded Plaintiff's impairments did not meet or medically equal the severity of a listed impairment. (Tr. 17) He concluded Plaintiff had the residual functional capacity to:

> Perform light work . . . except: no climbing of ladders, ropes, or scaffolds. Occasional climbing of ramps and stairs. Occasional balancing, stooping, kneeling, crouching and crawling. Occasional use of the bilateral lower extremities for operation of food controls. Uses a cane for ambulation. Able to sit and/or stand at will at the workstation, provided not off task for more than ten percent of the workday. Manipulative limitation of occasional use of bilateral upper extremities for overhead reaching. Frequent use of the bilateral upper extremities for reaching, handling, and fingering. Environmental limitation to avoid all exposure to hazards, such as moving machinery and unprotected heights. Additional environmental limitation to avoid concentrated exposure to irritants such as fumes, odors, dust, gases, and vibrations. Work limited to simple, routine, and repetitive tasks in a work environment free from fast paced production

requirements, such as moving assembly lines and conveyor belts, involving only work related decisions, with few if any work place changes. Occasional interaction with the general public, coworkers, and supervisors.

(Tr. 19). The ALJ found Plaintiff: had no past relevant work; was a younger individual at the time the application was filed, and an individual closely approaching advanced age at the time of the decision; and had a high school education. (Tr. 26). He concluded that given Plaintiff's age, education, work capacity, and RFC, jobs exist in significant numbers in the national economy that Plaintiff can perform, and therefore, she was not disabled. (Tr. 26-27).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

4.  Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

### DISCUSSION

Plaintiff raises two objections to the ALJ's decision: 1) the ALJ failed to provide good reasons for the weight given to the opinion of treating physician, Dr. Jones; and 2) the ALJ failed

to explain why he did not include the restriction by consultative examiner, Dr. Lakin, that Plaintiff required a cane while standing.

***Treating Physician***

Plaintiff's first argument implicates the well-known treating physician rule. Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

A treating physician's opinion is given "controlling weight" if it is supported by (1) medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, he must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). "Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight." *Wilson,* 378 F.3d at 544.

14

When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an in-depth or "exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011); *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009). The Sixth Circuit has held that an ALJ may also give "good reasons" by challenging the supportability and consistency of the treating physician's opinion in an "indirect but clear way", *Brock v. Comm'r of Soc. Sec.*, 368 F. App'x 622, 625 (6th Cir. 2010), or "implicitly provid[ing] sufficient reasons for not giving those opinions controlling weight, and indeed for giving them little to no weight overall", *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 472 (6th Cir. 2006); *see also Dutkiewicz v. Comm'r*, -- F. App'x --, 2016 WL 6068912, *1 (6th Cir.) ("[T]he ALJ's failure to explicitly consider [a treating physician's] opinion was, at most, harmless error because the ALJ indirectly rejected the conclusion that [plaintiff] was unable to work by reasonably explaining that the majority of medical evidence, the nature of [plaintiff's] treatment, and the other medical opinions in the record showed that [plaintiff] had the capacity to perform a limited range of sedentary work.").

Here, the ALJ recognized Dr. Jones was a treating physician[6] and explained:

Dr. Jones has consistently noted the claimant as "unemployable," often indicating carrying limitations at ten pounds, and standing/walking to one hour, with sitting limited to two hours during an eight-hour work day. These "reports[]" consist primarily of checking off a box on a pre-printed form. A check box is marked to indicate that the claimant is "unemployable for periods ranging for several months to one year at a time. These same reports have also indicated that the claimant's status was "good/stable with treatment." Little weight is accorded to these "opinions" provided by Dr. Jones. The ultimate issue of disability is a medical-vocational determination reserved for the Commissioner (SSR 96-5p). . . . [T]reating source opinions are to be given controlling weight if well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence. While objective evidence in the form of x-rays and MRIs supports a degree of *some* limitation due to back pain, it does not support a finding to preclude all working ability.

(Tr. 21) (internal citations omitted).

The undersigned finds substantial evidence supports the ALJ's decision regarding Dr. Jones's opinion and rejects Plaintiff's claim of error. First, the ALJ correctly disregarded Dr. Jones's opinion that Plaintiff was "unemployable" because the regulations reserve the ultimate decision regarding disability to the Commissioner. 20 C.F.R. § 404.1527(e)(1); *see also* 20 C.F.R. § 404.1527(e)(3) (no "special significance" given to opinions about disability, even those by treating physician); *Brock*, 368 F. App'x at 625.

Second, an ALJ may properly cite, as a reason for giving an opinion less weight, the "check-box" nature of that opinion. *See Ellars v. Comm'r of Soc. Sec.*, 647 F. App'x 563, 566 (6th Cir. 2016) ("Many courts have cast doubt on the usefulness of these forms and agree that administrative law judges may properly give little weight to a treating physician's 'check-off

_____

6. Plaintiff correctly points out that the ALJ mis-identified Dr. Jones as "a physician with Lucas County Job and Family Services" at one point. *See* Tr. 21. The citation provided by the ALJ is to a form Dr. Jones filled out *for* Lucas County Job and Family Services, he is not an employee. However, the remainder of the opinion makes clear that this error was not harmful, as the ALJ correctly identifies Dr. Jones as a treating physician. *See* Tr. 21 (noting, while addressing Dr. Jones's opinions: "[w]hile treating source opinions are to be given controlling weight if . . . . ").

16

form' of functional limitations that 'did not cite clinical test results, observations, or other objective findings . . . .'") (quoting *Teague v. Astrue*, 638 F.3d 611, 616 (8th Cir. 2011); *Price v. Comm'r of Soc. Sec.*, 342 F. App'x 172, 176 (6th Cir. 2009) ("Because [the treating physician] failed to identify objective medical findings to support his opinion [on a questionnaire] regarding [the claimant's] impairments, the ALJ did not err in discounting his opinion."); *see also Hyson v. Comm'r of Soc. Sec.*, 2013 WL 2456378, *14 (N.D. Ohio) (listing cases rejecting conclusory, or check box, opinions). The ALJ also relied on an internal inconsistency within Dr. Jones's check box forms—although he opined Plaintiff was "unemployable" and had extremely limited abilities to sit, stand, walk, and lift/carry, on most of these forms, he checked a box noting Plaintiff was "good/stable with treatment." (Tr. 21); *see also* Tr. 315, 326, 336, 339, 529, 568, 570.

Third, a review of the ALJ's decision as a whole indicates he gave Dr. Jones's opinion less than controlling weight because he found it to be inconsistent with and not supported by the record as a whole, as well as inconsistent with Dr. Jones's own records. The ALJ expressly assigned weight to the opinion as required by the regulations. *See* Tr. 21 ("Little weight is accorded to these 'opinions' provided by Dr. Jones."); 20 C.F.R. § 404.1527. The ALJ credited the "objective evidence in the form of x-rays and MRIs" to support "a degree of *some* limitation due to back pain," but concluded it "does not support a finding to preclude all working ability." (Tr. 21). Elsewhere in his opinion, the ALJ discussed the imaging studies regarding Plaintiff's back pain. *See* Tr. 22 ("Upon evaluation of an MRI scan with no evidence of central canal stenosis or cord compromise, Patrick W. McCormick, M.D., indicated that the 'etiology of the subjective parasthesias was uncertain.'") (citing Tr. 409); Tr. 22 ("A CT of the cervical spine indicated mild spondylosis at multiple levels, and chronic changes identified without evidence of

17

acute fracture or subluxation. A CT of the dorsolumbar spine indicated some chronic changes, including possible annular bulging from L3-4 through L5-S1; and chronic sclerosis at L5 and S1.") (citing Tr. 472); Tr. 22 ("Examination [in December 2012] indicated intact range of motion for all extremities. Normal gait and ambulation was indicated in the treatment record.") (citing Tr. 578); Tr. 22 ("Minimal tenderness at the cervical spine was indicated, with the ability for a full range of motion [in April 2013 to Dr. Jones]) (citing Tr. 572); Tr. 22 ("There were similar findings in October 2013, with tenderness at the lumbar spine indicated.") (citing Tr. 574).

Moreover, the ALJ discussed the inconsistencies between evidence of Plaintiff's reported activities with her claims of total disability. *See* Tr. 20 ("The undersigned notes that this seems to imply she was previously cooking and driving, contrary to her earlier disability reports."); Tr. 21 ("The claimant indicated to Job and Family Services that she was 'required to care for a disabled family member' to be excused from job training requirements.") (citing *inter alia*, Tr. 251, 258, 267, 274); Tr. 21 ("This travel to Hawaii in the fall of 2012, for vacation, seems inconsistent with both the claims of her own disability as well as her need to care for a disabled member of her household. The flight to Hawaii itself requires many hours of sitting on an airplane, which is inconsistent with the degree of neck and back pains she purports, and tends to support the observations of the consultative medical examiners, discussed below.") (citing Tr. 611) ("She states that in Sept. and Oct. she as on an extended vacation in Hawaii".); Tr. 22 ("The undersigned notes some inconsistency between this report of ability to perform activities of daily living ["easily"] prior to the MVA in April 2012, and the claimant's earlier disability reports.") (citing Tr. 194-202 (March 2012 function report); Tr. 203-07 (April 2012 pain questionnaire)). These inconsistencies identified by the ALJ are another reason—albeit indirect—for discounting

Dr. Jones's opinions of total disability spanning the time period from November 2008 through October 2013.

Plaintiff contends the ALJ failed to recognize Dr. Jones's long treating relationship with Plaintiff. While the ALJ did not expressly state he considered the treating relationship, a review of the decision indicates he was certainly aware of it. He cited Dr. Jones's treatment notes, diagnoses, and prescriptions from 2010 onwards in his summary of the medical evidence. (Tr. 21-22).

Finally, Plaintiff contends the ALJ merely analyzed whether Dr. Jones's opinion should be given controlling weight, but then did not do the appropriate analysis of factors to determine if the treating source should still be afforded deference. Plaintiff appears to argue that the ALJ must first determine whether the opinion is due controlling weight, and then perform a substantially similar analysis again when determining how much weight. When an ALJ determines a treating physician's opinion is not entitled to controlling weight, he must provide support to refute either the opinion's objective basis or its consistency with other record evidence. *Gayheart*, 710 F.3d at 376-77. The ALJ here focused on the second prong— consistency with the other record evidence. In the page prior to the ALJ's discussion of Dr. Jones's opinions, and in four pages following, the ALJ summarized the record evidence, specifically mentioning Dr. Jones's records, and noting the inconsistencies between Plaintiff's claims of disability and other evidence of record as discussed above. No more was required for the decision not to give the opinion controlling weight, nor to justify the weight given to the opinion. *See, e.g.*, *Aiello-Zak v. Comm'r of Soc. Sec.*, 47 F. Supp. 3d 550, 558 (N.D. Ohio 2014) ("[W]here the ALJ carefully summarized the results of the claimant's objective medical records, as well as noting the daily activities of the claimant, and then showed why the opinion of the

treating source was inconsistent with these facts, the decision to accord the opinion of the treating source 'not much weight' was supported by substantial evidence and not violative of *Gayheart*.") (citing *Dyer v. Soc. Sec. Admin*, 568 F. App'x 422, 426 (6th Cir. 2014)).

Thus, the undersigned concludes the ALJ appropriately gave "good reasons" for his decision to give Dr. Jones's opinions "little weight." He discussed the checkbox nature of the opinions, their supportability, and their consistency with the record as a whole. A review of the ALJ's decision as a whole provides reasons "sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight." *Wilson,* 378 F.3d at 544. This is so even if such reasons are not included directly in the paragraph discussing those opinions. *See Brock*, 368 F. App'x at 625; *Nelson*, 195 F. App'x at 472; *Dutkiewicz v. Comm'r*, -- F. App'x --, 2016 WL 6068912, at *1.

### RFC Determination / Dr. Lakin

Plaintiff's second argument is the ALJ failed to include a restriction for use of a cane while standing in his RFC, despite giving the opinion Dr. Lakin—who expressed such a limitation was necessary—the moderate weight. The Commissioner responds that the ALJ's determination was supported by substantial evidence. As discussed below, the undersigned agrees with the Commissioner.

In his consultative examination report, Dr. Lakin opined Plaintiff could "stand and walk occasionally with the use of her cane". (Tr. 535). Plaintiff contends the ALJ erred by failing to acknowledge or explain his rejection of this limitation, despite assigning Dr. Lakin's opinion "moderate weight". Defendant responds that the ALJ was not required to adopt or discuss the entirety of Dr. Lakin's opinion, nor is such a limitation supported by the record.

20

An ALJ is not required to adopt all limitations in a particular opinion, even one to which he assigns "great weight". *See, e.g., Smith v. Colvin*, 2013 WL 6504681, at *11 (N.D. Ohio) (finding an ALJ who attributes "great weight" to state-reviewing psychologist opinions not required to include in claimant's RFC all limitations assessed by them); *Hericks v. Astrue*, 2012 WL 161105, *7 (S.D. Ohio) ("The fact that the ALJ did not entirely adopt either of the RFC opinions offered by treating and consulting physicians is not contrary to the Sixth Circuit's opinion in *Hensley,* because the ALJ's analysis explains the basis for his opinions.") The final responsibility for determining a claimant's RFC "rests with the ALJ, not a physician." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x. 149, 157 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1546(c), 416.946(c)); *see also* SSR 96-5p, 1996 WL 374183, *4 ("Even though the adjudicator's RFC assessment may adopt the opinions in a medical source statement, they are not the same thing.").

First, although the ALJ here stated he was giving the "moderate weight" to Dr. Lakin's opinion, he did not state he was adopting that opinion *in toto*. (Tr. 25). Second, in his summary of Dr. Lakin's opinions, the ALJ noted Dr. Lakin's observations indicating he believed Plaintiff to be exaggerating her symptoms. (Tr. 23-24). He also noted he did not adopt Dr. Lakin's opinion in its entirety because he found the evidence as a whole: 1) supported greater restrictions regarding the overall exertional level—limiting Plaintiff to light, rather than medium work; and 2) supported lesser restrictions regarding postural movements. *Id.* Although he did not specifically mention rejecting the restriction regarding a cane Plaintiff now raises, it is clear that the ALJ did not somehow miss this this restriction Dr. Lakin expressed, because on the previous page of his decision, he specifically noted it in summarizing Dr. Lakin's opinion. *See* Tr. 24 ("Dr. Lakin indicated the claimant would be able to . . . stand and walk occasionally with the use of a cane.").

21

The undersigned agrees with the Commissioner that, when read as a whole, Dr. Lakin's opinion in its entirety does not strongly support a restriction requiring the use of a cane for standing. *See* Tr. 533 (noting Plaintiff was "not very compliant with the exam" and was "obviously exaggerating her symptoms"); 534 (noting Plaintiff had "[n]o trouble getting on and off the exam table without my assistance"); 534-35 (noting Plaintiff "claims she is dependent on a cane full-time for ambulation and standing" and "claims she has difficulties with [activities of daily living]. Overall, I feel she is exaggerating her symptoms in today's visit and the extent of her disability is unclear to me"). Nor is there any other evidence in the record showing a medical prescription for a cane, or suggesting Plaintiff needs a cane for standing. Moreover, there was evidence in the record to the contrary cited by the ALJ elsewhere in his opinion. *See* Tr. 23 ("[a]lthough the claimant indicated weakness in her right lower and upper extremities, her ambulation and gate were not affected.") (citing Tr. 381) (Dr. Padamadan's May 2012 evaluation); Tr. 22 ("Normal gait and ambulation was indicated in the treatment record.") (citing Tr. 577-79) (December 2012 emergency room records noting "[p]atient walks without difficulty" and "[n]ormal gait/ambulation"). Therefore, it was not error for the ALJ to not include such a limitation in his final RFC.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI is supported by substantial evidence, and therefore affirms the Commissioner's decision.

   s/James R. Knepp II
United States Magistrate Judge